UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------X
JASON ABRAMS o/b/o J.T.A.,

               Plaintiff,           **MEMORANDUM & ORDER**

     -against-              13-CV-5568 (KAM)

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.
--------------------------------------X
**MATSUMOTO, United States District Judge:**

        Pursuant to 42 U.S.C. § 405(g),[1] plaintiff Jason Abrams

("plaintiff"), on behalf of his minor child J.T.A. ("claimant"),

appeals the final decision of defendant Commissioner of Social

Security ("defendant" or the "Commissioner"), who denied

plaintiff's application for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act (the "Act").

(Compl., ECF No. 1, dated 10/3/13.)  Plaintiff commenced this

action *pro se* but obtained counsel on July 17, 2014.  (Notice of

Appearance, ECF No. 16, dated 7/17/14.)  Presently before the

court are the parties' cross-motions: defendant's motion for

judgment on the pleadings and plaintiff's motion to remand for

further proceedings.  (*See* Def.'s Mem. of Law in Support of Mot.

for J. on the Pleadings ("Def. Mem."), ECF No. 12, dated

---
[1] Individuals may seek judicial review in the United States district court for the judicial district in which they reside of any final decision of the Commissioner of Social Security rendered after a hearing to which they were a party, within sixty days after notice of such decision or within such further time as the Commissioner may allow.  *See* 42 U.S.C. § 405(g).

4/17/14; Mem. of in Support of Pl.'s Cross-Mot. to Remand ("Pl. Mem."), ECF No. 20, dated 9/8/14.) For the reasons set forth below, plaintiff's motion is granted, defendant's motion is denied, and the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

J.T.A. was born on March 9, 2005. (Tr. 78.)[2] Claimant was three years old at the alleged onset of disability (May 1, 2008). (*Id.*) Plaintiff was awarded sole custody of J.T.A. by order of the Family Court of the State of New York on February 23, 2010. (Tr. 150.) On March 8, 2010, J.T.A. was examined at Cardinal McCloskey Services, incident to discharge from foster care to the care of his father. (Tr. 273-74.)

J.T.A. was treated at the Mount Sinai Medical Center emergency room on three occasions prior to plaintiff's application for SSI. (Tr. 257-72.) On May 26, 2008, J.T.A. was admitted for upper respiratory infection ("URI") symptoms of sore throat, ear pain and nasal congestion and was prescribed Bicillin, an antibiotic medication. (Tr. 267-72.) On January 23, 2010, J.T.A. was admitted to the emergency room and treated for URI symptoms of sore throat, rhinorrhea, and body aches.

---

[2] Citations to the administrative record are indicated by the abbreviation "Tr."

(Tr. 262-66.)  On February 23, 2010, J.T.A. was treated for sore throat and fever and was prescribed Bicillin.  (Tr. 257-61.)

## I.   Individualized Education Programs ("IEP")[3]

### A. October 21, 2009 IEP

On October 21, 2009, the DOE developed an IEP for J.T.A., who was four years old at the time, for the 2009-2010 school year.  (Tr. 244-55.)  The IEP classified J.T.A. as a preschool student with a disability and placed him in a 7:1:1 class (seven students, one special education teacher, and one general education teacher) in an integrated setting[4] at the ABC Graham School for five hours a day, five days a week.  (Tr. 244.)  The IEP also assigned J.T.A. a one-on-one aide and twice-weekly individual counseling at a separate location.  (Tr. 244, 253-55.)

Under the heading of Academic Performance and Learning Characteristics, a speech and language evaluation found that J.T.A. had grossly age appropriate language skills, but mild delays were evident in his articulation skills.  (Tr. 246.) Speech and language services were not recommended "at this time.

---

[3] According to the New York City Department of Education ("DOE"), the IEP documents a child's eligibility for special education services and formalizes the school system's plan to provide special education services that are appropriate for the child's unique needs.  It contains specific information about the child and the education program designed to meet those needs.  *See* DOE Special Education Glossary, http://schools.nyc.gov/Academics/Special Education/ContactsResources/glossary/default.htm (last visited Feb. 8, 2016).
[4] An integrated setting refers to classrooms that include students with and without disabilities.  *See* Integrated Co-Teaching, http://schools.nyc.gov/ Academics/SpecialEducation/programs/environment/ict.htm (last visited Feb. 8, 2016).

(*Id.*)  J.T.A. was active and well-related.  (*Id.*)  The IEP

reported intelligence quotient ("IQ") testing utilizing the

Stanford-Binet Intelligence Scales.  (Tr. 247.)  J.T.A. attained

a Full-Scale IQ of 84, which is classified as low average; a

verbal IQ of 76, which is classified as borderline; and a

nonverbal IQ of 95, which is classified as average.  (*Id.*)  On

the Vineland Adaptive Behavior Scales, J.T.A. fell within the

moderately low range in communication, socialization and daily

living skills, and the adequate range in motor skills.  (*Id.*)

Under the heading of Social/Emotional Performance, the

October 21,2009 IEP stated:

> [J.T.A.'s] behaviors are regressing, he is
> biting, kicking and screaming once again. He
> cries throughout much of the day and cannot
> tolerate other children within close proximity to
> himself. He will not share his play things or
> even play space. He has difficulties with
> transitions. He does not have a sense of good
> sense of awareness of his space.  He bumps and
> crashes into others.

(Tr. 248.)  The IEP stated that J.T.A.'s behaviors "seriously

interferes with instruction and requires additional adult

support."  (*Id.*)

Under the Health and Physical Development heading, the

October 21, 2009 IEP reported results of an occupational therapy

evaluation due to fine motor and sensory concerns.  (Tr. 249.)

J.T.A.'s aunt reported that he exhibited "high activity level,

aggressiveness towards others, tantrums when needs are not met,

and limited safety awareness." (*Id.*)  A sensory profile revealed that J.T.A. presented with typical performance compared to his peers in most areas, indicating that he did not have significant delays in processing skills. (*Id.*)  His relatively poor performance was "significantly related to his difficulty following directions and self-directed behaviors." (*Id.*)  The IEP noted that J.T.A. had minimal delays in fine and visual motor skills, and appeared to have no delays in his self-care skills. (*Id.*)  His strength was age appropriate for completing fine and gross motor skills, and his muscle tone was normal. (*Id.*)  The IEP found that J.T.A. "requires a more structured environment with a reward system in place," noting that he "responded well on the evaluation when given a reward for completing a task, indicating that he understands directions, but does not willingly follow them." (*Id.*)

The IEP set annual goals for J.T.A. to improve overall functioning within the classroom, to improve overall social skills and play skills within the classroom, to develop coping strategies within the classroom, and to recognize and express feelings and emotions. (Tr. 250-52.)  J.T.A.'s short-term objectives included the following: J.T.A. would learn to transition into the classroom in the morning without tantruming three out of five days; he would be able to clean up after meals with minimal prompting in five out of seven tries; he would be

able to verbalize "I need a break" when he began to feel frustrated in three out of five tries; he would be able to share a tabletop toy with a peer for three to five minutes; he would be able to have verbal exchanges with a peer in three out of five tries; he would be able to express himself in words without tantruming in three out of five tries; and he would use self-regulating exercises such as breathing, counting to ten and squeezing an object, prior to yelling and throwing himself on the floor when frustrated. (*Id.*)

Under the Other Programs/Services Considered and Reasons for Rejection heading, the October 21, 2009 IEP stated that J.T.A. "continues to demonstrate delays in cognition and in the social, emotional area. He was reluctant to do tasks presented. He required coaxing, prompting, support and encouragement to complete tasks. [J.T.A.] does not like to share and can become aggressive and have tantrums." (Tr. 254.) The "IEP noted that transferring J.T.A. to another school would do more harm than good, as he had undergone many transitions in his life and his present school represented a positive constant in his life. (*Id.*) The IEP concluded that J.T.A. required "an integrated setting with a 1:1 aide." (*Id.*)

## B. October 15, 2010 IEP

On October 15, 2010, the DOE prepared an IEP for J.T.A.'s kindergarten school year. (Tr. 203-17.) The DOE

classified J.T.A. with an emotional disturbance disability[5] and placed him in a class with an 8:1:1 staffing ratio in a specialized school. (Tr. 203.) The IEP prescribed continued counseling, two sessions weekly in a separate location. (Tr. 217.)

Academically, J.T.A. was performing at an age-appropriate level in English, arts, and math. (Tr. 205.) The IEP noted, however, that J.T.A. has difficulty putting sounds together and cannot identify vowel sounds, has difficulty counting numbers by 2's, 5's, or 10s, and struggles to compare groups and cannot determine which is less, more, or the same. (*Id.*) The October 15, 2010 IEP stated that J.T.A. required a small structured class setting with constant repetition and redirection to maintain focus and learn new concepts. (*Id.*) Socially and emotionally, J.T.A. enjoyed participating in class, helping his teachers, and playing and working with his peers. (Tr. 206.) The IEP also noted that J.T.A. had difficulty waiting his turn and remaining seated, and became easily

[5] Pursuant to 8 N.Y.C.R.R. § 200.1(zz)(4), a special education classification of emotional disturbance is defined as follows: "Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a student's educational performance: (i) an inability to learn that cannot be explained by intellectual, sensory, or health factors; (ii) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers; (iii) inappropriate types of behavior or feelings under normal circumstances; (iv) a generally pervasive mood of unhappiness or depression; or (v) a tendency to develop physical symptoms or fears associated with personal or school problems. The term includes schizophrenia. The term does not apply to students who are socially maladjusted, unless it is determined that they have an emotional disturbance."

frustrated and was unresponsive at times. (*Id.*) J.T.A.'s behavior did not seriously interfere with instruction and could be addressed by the special education teacher. (*Id.*) The IEP provided the following annual goals relating to his social and emotional development: J.T.A. will demonstrate frustration tolerance; and J.T.A. will demonstrate an increased respect for authority figures. (Tr. 214.) A behavior intervention plan contained in the October 15, 2010 IEP identified behaviors that interfered with learning: J.T.A. became easily distracted and frustrated; and that "[w]hen his demands are not met he becomes unresponsive and cries." (Tr. 216.) The IEP gave the following expected behavior changes: that J.T.A. would follow routines, instructions and directions promptly; he would interact with peers in a positive manner; and he would act in a cooperative manner and follow classroom rules. (*Id.*) The IEP recommended the implementation of a point/reward system for all school activities, where rewards and verbal praise would be given in response to appropriate behavior. (*Id.*)

### C. October 14, 2011 IEP

On October 14, 2011, the DOE prepared an IEP for J.T.A.'s first-grade school year. (Tr. 275-85.) As in the previous year, the DOE classified J.T.A. with an emotional disturbance disability and placed him in a specialized school

with an 8:1:1 class. (Tr. 275-76, 282.) A 12:1:1 class was considered and rejected, because J.T.A. required more intense supervision and a smaller class setting to address his social and emotional needs. (Tr. 276.) A special education class in a community school was considered and rejected because J.T.A. "requires a more restrictive environment." (*Id.*) Counseling at a separate location was continued from the previous year, but was changed to counseling in a group of three "to improve his social/programmatic skills amongst his peers and across all environments." (Tr. 278, 282.) The IEP specified test-taking accommodations including extended time and test questions to be read and re-read to him for assessments in all subject areas. (Tr. 283.)

Academically, the IEP reported that J.T.A. was a "bright" child with grade-level academic skills, except for some difficulty with his writings kills. (Tr. 277.) J.T.A. was self-sufficient in all daily living skills, such as eating, dressing, and cleaning himself. (*Id.*) The IEP noted that J.T.A. was unable to write a simple sentence. (*Id.*) As indicated in the previous year's IEP, J.T.A. required a small, structured environment. (Tr. 277-78.)

In relation to social development, the IEP stated that J.T.A. gets along with his peers and enjoys helping teachers and participating in class. (Tr. 278.) The IEP also notes,

however, that J.T.A. does have difficulty with waiting his turn at times, can also become frustrated and unresponsive. (*Id.*) J.T.A. responds well to the behavior point system used in class and to positive reinforcements. (*Id.*) The IEP noted that J.T.A. requires redirection, repetition, and positive reinforcements to maintain focus and learn new concepts and also requires a small, structured environment to learn. (*Id.*)

## II.  Teacher Questionnaire

On June 21, 2010, J.T.A.'s preschool teacher, Ms. Francis Gonzalez, and the school director, Ms. Mary Ellen Rooney, completed a teacher questionnaire in response to a request from New York State Office of Temporary and Disability Assistance. (Tr. 168-73.) This report includes information on only three of the six functional domains and is missing information on attending and completing tasks, moving about and manipulating objects, and health and physical well-being. (*Id.*) In the domain of acquiring and using information, the teachers stated that J.T.A. has "slight" or "no" problems in this area, and only one "obvious" problem—that of comprehending oral instructions. (Tr. 170.) In the domain of interacting and relating with others, the teachers stated that on a daily basis J.T.A. has "serious" problems in expressing anger appropriately, asking permission appropriately, and respecting and obeying adults in authority, and has "obvious" problems in following

rules (classroom, games, sports), using appropriate language, and interpreting nonverbal cues from others. (Tr. 171.) The teachers stated that behavior modification strategies were necessary and noted that J.T.A. was assigned a 1:1 management paraprofessional. (*Id*.) In the domain of caring for himself, the teachers indicated a "serious" daily problem in using good judgment regarding personal safety and dangerous circumstances, and "obvious" daily problems in handling frustration appropriately, being patient when necessary, identifying and appropriately asserting emotional needs, responding to changes in own mood (e.g., calming self), and using appropriate coping skills to meet daily demands of school environment. (Tr. 172.)

**III. Report Card**

J.T.A.'s first grade report card for the 2011-2012 school year provides grades for the first two grading periods of the school year but lack J.T.A.'s grades for the final period. (Tr. 226-28.) The report card employed a numerical system with a 1 indicating far below grade level standards; 2 indicating performance approaching grade level standards; a 3 indicating performance meeting grade level standards; and a 4 indicating performance exceeding grade level standards. (Tr. 226.)

In the first trimester, J.T.A. was given overall grades of 1+ in writing and social studies; 2 in reading, mathematics, science, and arts; and 2+ in physical education.

(Tr. 227.)  The teacher commented that J.T.A. was showing overall improvement in academic skills, but he needed to improve attendance and complete homework assignments. (Tr. 226.) J.T.A.'s counselor noted that it was a pleasure working with J.T.A. on problem solving skills.  (Tr. 228.)

In the second trimester, J.T.A. was given overall grades of 2 in science and physical education; 2+ in listening and speaking, social studies, and arts; and 3 in mathematics. (Tr. 227.)  J.T.A.'s teacher commented that he has shown academic improvement but has difficulty following class rules, noting that he "tends to laugh constantly during class lessons." (Tr. 226.)  The teacher also asked plaintiff to speak to J.T.A. about his behavior.  (*Id.*)  The counselor reported that it is great working with J.T.A. who has shown some progress and that they are working on expressing frustration without conflict. (Tr. 228.)

## IV.  Non-Examining Medical Reviewer Report

On August 18, 2010, State agency medical consultant, Dr. M. Malik, a pediatrician, completed a "Childhood Disability Evaluation Form."  (Tr. 234-39.)  Dr. Malik determined that J.T.A. had a marked limitation in the domain of interacting and relating to others, noting that J.T.A. has a severe behavioral problem.  (Tr. 236.)  Dr. Malik found that J.T.A. had less than marked limitations in the other five domains: acquiring and

12

using information; attending and completing tasks; moving about and manipulating objects; caring for himself; and health and physical well-being. (Tr. 236-37.) Dr. Malik concluded that J.T.A.'s combination of alleged impairments was severe, but they did not meet, medically equal, or functionally equal the criteria in Appendix 1 to 20 C.F.R. Part 404, Subpart P (Listing of Impairments). (Tr. 234.) Dr. Malik noted the parts of J.T.A.'s teacher questionnaire that related to attending and completing tasks and speech intelligibility were missing and requested those parts of the report. (Tr. 240.)

## V.    Reports by Plaintiff

On June 7, 2010, Plaintiff completed a Function Report for submission to the Social Security Administration. (Tr. 195-202.) Plaintiff reported that J.T.A. had no problems seeing, hearing, talking, communicating, understanding and using what he learns, engaging in physical activity, or taking care of personal needs. (Tr. 196-99, 201.) He stated that J.T.A.'s impairment affected his behavior with other people. (Tr. 200.) Specifically, he noted that J.T.A. did not enjoy being with peers, show affection to other children, share toys or take turns, "pretend" with other children or play games, such as hide-and-seek or board games. (*Id*.) J.T.A. did show affection towards his parents. (*Id*.) Plaintiff further stated that

J.T.A.'s ability to pay attention was limited, and that J.T.A. could not sit for more than five minutes.  (Tr. 201.)

In a questionnaire completed on July 9, 2010, plaintiff stated that J.T.A. tripped all the time, was shy around relatives and strangers, slurred his speech, was a messy eater, had difficulty getting along with others and sharing, and acted out when he did not get his way.  (Tr. 165.)  Plaintiff reported that he had been notified on numerous occasions that J.T.A. was at risk of suspension from school due to his behavior.  (Tr. 166.)

## VI.  Administrative Law Judge ("ALJ") Hearings

At the first hearing held July 8, 2011 before ALJ Friedman, plaintiff and J.T.A. appeared *pro se* and testified. (Tr. 47-60.)  The hearing lasted fifteen minutes.  (*See* Tr. 49, 60.)  Plaintiff stated that J.T.A. had just finished kindergarten.  (Tr. 50.)  Plaintiff testified that in school J.T.A. had difficulty listening, paying attention, and following directions.  (Tr. 51.)  Plaintiff testified that J.T.A. has behavioral problems and "gets blamed a lot for things in school."  (*Id.*)  Plaintiff stated that J.T.A. was taking prescribed medications for asthma, which was controlled "at times," but less well controlled in spring and winter.  (Tr. 51-52.)  Plaintiff stated that J.T.A. has some friends with whom he likes to play. (Tr. 52.)

J.T.A. testified that he likes to watch television, play with his toys, and "play with daddy." (Tr. 52-53.) He also testified that when he grows up he wants to be a dentist. (Tr. 53.) J.T.A. stated that he likes to play with his friends, but in school, "other kids in my class were bothering [him]," and he nodded his head when ALJ Friedman asked whether he gets upset and angry. (Tr. 53-54.)

Plaintiff testified that J.T.A. receives counseling in school, and was seeing a therapist outside of school but not at that time. (Tr. 54.) When asked how J.T.A. differs from other children his age, plaintiff stated that he does not listen at all, he cries all the time and has outbursts. (Tr. 54-55.) Plaintiff testified that J.T.A.'s main difficulties are behavioral problems and emotional disturbances, and when he does not get his way he wants to lash out, put on a scene, and throws tantrums. (Tr. 55-56.)

On May 7, 2012, plaintiff appeared *pro se* without J.T.A. and testified at a hearing before ALJ Scheer. (Tr. 61-77.) The hearing before ALJ Scheer lasted 21 minutes. (*See* Tr. 63, 77.) Plaintiff testified that he lived with his 25-year-old niece and J.T.A. (Tr. 67.) J.T.A. was seven years old and in second grade at a specialized school for children with disabilities. (Tr. 68.) Plaintiff testified that J.T.A.'s class had eight children, two teachers, and a paraprofessional

educator.  (Tr. 68-69.)  Plaintiff testified that J.T.A. has a learning disability, saying "it takes a long time for him to pick up, to learn, to catch on."  (Tr. 69.)  He has behavioral disabilities, saying he does not listen, acts out and is sometimes uncontrollable.  (*Id*.)  Plaintiff testified that when J.T.A. gets in trouble, he is not able to participate in school activities due to his behavior.  (*Id*.)  Plaintiff testified that J.T.A. repeatedly has to switch day care providers because "he gets kicked out of different day cares."  (Tr. 71.)

Plaintiff testified that after school J.T.A. does his homework and watches television, and sometimes he takes J.T.A. outside to throw a ball.  (Tr. 74.)  Plaintiff stated that J.T.A. loves school.  (Tr. 74-75.) Plaintiff testified that J.T.A.'s teachers tell him that J.T.A. is very smart but acts out in class, and that it takes a long time for J.T.A. to "catch onto things" and the teachers have to "go over something with him over and over."  (Tr. 75.)

## PROCEDURAL HISTORY

On June 7, 2010, plaintiff filed an application for SSI benefits on behalf of J.T.A., with an alleged onset date of May 1, 2008.  (Tr. 78.)  Plaintiff alleged that J.T.A. was disabled due to asthma, learning disability, and speech impairment.  (Tr. 177.)  Plaintiff's application was denied on August 24, 2010.  (Tr. 103-06.) On August 4, 2011, the ALJ

issued a decision finding that J.T.A. was not disabled under the Act. (Tr. 79-96.)

Plaintiff requested review of the ALJ's decision, and in an order dated December 2, 2011, the Appeals Council vacated ALJ Friedman's decision and remanded the case for further proceedings, directing the ALJ to ensure that plaintiff was advised of his right to representation and to further develop the record by obtaining all of the pages of the questionnaire completed by J.T.A.'s teacher, Francis Gonzalez ("Ms. Gonzalez"). (Tr. 98.)

On May 7, 2012, plaintiff appeared *pro se* at a hearing before ALJ Kenneth L. Scheer. (Tr. 61-77.) In a decision dated May 25, 2012, ALJ Scheer found that J.T.A. was not disabled under the Act. (Tr. 14-37.) Plaintiff requested review of the ALJ's decision. (Tr. 4-6.) On July 30, 2013, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. (Tr. 1-3.)

The court herein summarizes ALJ Scheer's decision, which is the Commissioner's final decision appealed to this court. At step one of the analysis, the ALJ found that J.T.A had not engaged in substantial gainful activity since the application date. (Tr. 20.)

At step two, the ALJ found that plaintiff had a severe impairment, an emotional disturbance. (*Id.*) The ALJ found claimant's asthma was a non-severe impairment. (*Id.*) The ALJ found, however, that the claimant "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926)." (Tr. 21.) Specifically, the ALJ found that the record failed to document "marked inattention, impulsivity or hyperactivity." (*Id.*) The ALJ noted, *inter alia*, that J.T.A. got along with his teachers and peers, took turns, used adequate vocabulary and grammar to express his thoughts, and related experiences. (*Id.*)

Under step three of the analysis, the ALJ found that claimant does not have "an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a)." (*Id.*) The ALJ considered the degree of claimant's limitation in the six functional equivalence domains. (*Id.*) The ALJ found that J.T.A. has less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating to others, moving about and manipulating objects, and health and physical well-being. (Tr. 22-34.) The ALJ found that J.T.A. has no limitation in the ability to care for himself. (Tr. 32.) The ALJ concluded that

J.T.A. was not disabled, because he does not have an impairment or combination of impairments that result in either marked limitations in two domains of functioning or extreme limitation in one domain of functioning. (Tr. 34.)

## DISCUSSION

## I. Standard of Review

The reviewing court does not review *de novo* the Commissioner's determination of whether a claimant is disabled. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). Instead, the reviewing court assesses: (i) whether proper legal standards for disability determination were applied, and (ii) whether substantial evidence supports the findings of fact. *Id*; *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984). The decision must stand if the Commissioner's decision applies the correct legal standards and is supported by substantial evidence. *See Mullings v. Colvin*, No. 13-cv-1705, 2014 WL 6632483, at *11 (E.D.N.Y. Nov. 21, 2014).

The reviewing court must be certain that the ALJ considered all the evidence when assessing the legal standards and evidentiary support used by the ALJ in his disability finding. *See* 42 U.S.C. § 405(g) ("[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the

cause for a rehearing."). The reviewing court is authorized to remand the Commissioner's decision to allow the ALJ to further develop the record, make more specific findings, or clarify his rationale. *See Grace v. Astrue,* No. 11-cv-9162, 2013 WL 4010271, at *14 (S.D.N.Y. July 1, 2013); *see also Butts v. Barnhart,* 388 F.3d 377, 385-86 (2d Cir. 2004) ("where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate.").

## II. Legal Standards

### A. Disability Claims of Children

To qualify as disabled under the Act, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). By regulation the Commissioner has promulgated a three-step analysis to determine whether a child is eligible for SSI benefits on the basis of a disability. *Encarnacion ex rel. George v. Astrue*, 568 F.3d 72, 75 (2d Cir. 2009) (*citing* 20 C.F.R. § 416.924, *et seq.*). First, the ALJ determines whether the child is engaged in "substantial gainful activity." 20 C.F.R. § § 416.924(a), (b). Second, the ALJ considers whether the child has a "medically determinable

impairment that is severe," in that it causes "more than minimal functional limitations." 20 C.F.R. § 416.924(c). If a severe impairment is present, the ALJ must then consider whether the impairment "meets, medically equals," or "functionally equals" a presumptively disabling condition listed in the regulatory "Listing of Impairments." 20 C.F.R. § 416.924(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The limitations caused by a child's severe impairment(s) are evaluated in the context of the following six domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) the child's health and physical well-being. 20 C.F.R. § 416.926a(b)(1). "For a child's impairment to functionally equal a listed impairment, the impairment must 'result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.'" *Encarnacion*, 568 F.3d at 75 (quoting 20 C.F.R. § 416.926a(a)). An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). A "marked limitation" is an impairment that "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20

C.F.R. § 416.926a(e)(2)(i).  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

## B. The ALJ's Affirmative Duty to Develop the Record

SSA regulations require that the Commissioner "make every reasonable effort" to assist the claimant in developing a "complete medical history."  20 C.F.R. § 404.1512(d).  This Circuit has held that the "ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal citations and quotations omitted).  It is therefore "the ALJ's duty to seek additional information from the [treating physician] *sua sponte*" when the claimant's medical record is inadequate.  *Schaal v. Apfel*, 134 F.3d, 496, 505 (2d Cir. 1998). Furthermore, when a claimant proceeds *pro se*, the ALJ has a "heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir. 1990) (*citing Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir.

1982)).  Courts have also noted that the "heightened duty of the ALJ to develop the record of a *pro se* claimant is especially important if the claimant is a child."  *Blash ex rel. D.A.S. v. Colvin*, No. 13-CV-4089 JG, 2014 WL 1278151, at *3 (E.D.N.Y. Mar. 27, 2014); *see also Colon v. Apfel,* 133 F. Supp. 2d 330, 343-44 (S.D.N.Y. 2001); *Marquez o/b/o Infante v. Shalala,* 898 F. Supp. 238, 241 (S.D.N.Y. 1995).

The ALJ's affirmative duty to develop the record is appropriate in light of this Circuit's observation that "the Social Security Act is remedial or beneficent in purpose, and therefore, to be broadly construed and liberally applied." *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) (internal quotations omitted).  The Act's "intent is inclusion rather than exclusion." *Marcus v. Califano*, 615 F.2d 23, 29 (2d Cir. 1979).

## APPLICATION

### I. The ALJ Failed to Adequately Develop the Record

It is the duty of the ALJ to fully and completely develop the administrative record.  *See Gold v. Sec'y of HEW,* 463 F.2d 38, 43 (2d Cir. 1972)); *Rodriguez v. Barnhart,* No. 02-CV-5782, 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (*citing Brown v. Apfel,* 174 F.3d 59 (2d Cir. 1999)). Federal regulations require

the ALJ to "consider all relevant information" in a claimant's case record. 20 C.F.R. § 416.924a(a). In a case involving a school-age child, an ALJ's obligation to develop the administrative record includes an obligation to obtain information about how the claimant is functioning in school and any related educational reports. 20 C.F.R. § 416.924a(a)(2)(iii) states:

> If you go to school, we will ask for information from your teachers and other school personnel about how you are functioning there on a day-to-day basis compared to other children your age who do not have impairments. We will ask for any reports that the school may have that show the results of formal testing or that describe any special education instruction or services, including home-based instruction, or any accommodations provided in a regular classroom.

Here, ALJ Scheer did not adequately develop claimant's educational record. ALJ Scheer improperly relied upon an incomplete teacher questionnaire by Francis Gonzalez and Mary Ellen Rooney (the "teacher questionnaire") for the 2009-2010 academic year. The teacher questionnaire included information on only three of the six functional domains and is missing information on attending and completing tasks, moving about and manipulating objects, and health and physical well-being. (Tr. 168-73.)

In reaching his decision, the ALJ relied heavily on the teacher questionnaire for the completed functional domains.

For example, when considering J.T.A.'s limitations in acquiring and using information, the ALJ considered that the teacher questionnaire reported that J.T.A. had an obvious problem comprehending oral instructions, but otherwise had only a slight or no problem "in acquiring and using information and took turns, use adequate vocabulary and grammar to express his thoughts, was relevant in conversation, related experiences, made and kept friends and played cooperatively with other children." (Tr. 23.) For the missing functional domains, the ALJ necessarily did not and was not able to consider the teacher questionnaire. Given that the teacher questionnaire is the only assessment in the record of claimant's functional domains by individuals who were able to evaluate how he was functioning at school on a day-to-day-basis, the ALJ erred by inconsistently considering the teacher questionnaire for the three completed functional domains and not considering the teacher questionnaire for the three missing functional domains. In other words, the ALJ failed to adequately develop the record in terms of evaluation of claimant's functional domains by his teachers or other school personnel.

The court notes that the Appeals Council remanded ALJ Friedman's decision in part because pages from the teacher questionnaire were missing and "therefore the entirety of the opinion cannot be properly evaluated pursuant to 20 CFR

416.924a(a)(2)(iii)." (Tr. 98.) Although the court appreciates

the ALJ's efforts to obtain the complete questionnaire from Ms.

Gonzalez[6], they do not alleviate the ALJ's duty to develop

claimant's educational record. The ALJ court have, but did not,

request the teacher to complete another evaluation, or otherwise

seek her ion put if the original complete questionnaire could

not be located. Nor did the ALJ seek subsequent teacher

questionnaires for the 2010-2012 academic years, nor obtain

J.T.A.'s test reports or psychological evaluations, as plaintiff

suggests. (Pl.'s Reply at 6-7, ECF No. 28.)

In light of plaintiff and claimant's *pro se* status,

the ALJ had a "heightened duty to scrupulously probe into,

inquire of, and explore for all the relevant factors" when

compiling the administrative record. *Cruz v. Sullivan*, 912 F.2d

8, 11 (2d Cir. 1990) (*citing Echevarria v. Sec. of Health and

Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)). Given the

ALJ's heightened duty to protect *pro se* litigants, which is

"particularly acute" when the claimant is a child, *Price o/b/o

A.N. v. Astrue*, NO. 09-cv-5109, 42 F. Supp. 3d 423, 432

(E.D.N.Y. 2014), the court finds that the ALJ has failed to

adequately develop the J.T.A.'s educational record, and

therefore the ALJ's decision is not supported by substantial

---

[6] ALJ Scheer contacted Ms. Gonzalez on multiple occasions in an effort to obtain the complete teacher questionnaire, but Ms. Gonzalez was not able to provide the completed questionnaire. (Tr. 66-67, 222-25.)

evidence. *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996) (holding ALJ's decision is not supported by substantial evidence when ALJ failed to adequately develop the administrative record).

## II. The ALJ Failed to Consider and Weigh Dr. Malik's Opinion

The ALJ further erred by failing to consider and explain why he did not give any weight Dr. Malik's opinion. Dr. Malik is a consulting pediatrician who reviewed J.T.A.'s file and completed a Childhood Disability Evaluation Form on August 18, 2010. (Tr. 234-39.) Dr. Malik determined that J.T.A. had a marked limitation in the domain of interacting and relating to others, but found that J.T.A. had less than marked limitations in acquiring and using information, attending and completing tasks, moving about and manipulating objects; caring for himself, and health and physical well-being. (Tr. 236-37.)

Pursuant to 20 C.F.R. § 927(e)(2)(ii), "unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant." Here, the record lacks any opinion from a treating source, and the ALJ was required to explain the weight given to the opinion of Dr. Malik, the only medical opinion in the record concerning J.T.A.'s impairments and their severity. The ALJ, however, did not make any mention of Dr. Malik's opinion in his

decision, nor did he evaluate and properly explain why he did not give any weight to the opinion.

Defendant concedes that although "an ALJ should generally explain the weight given to each opinion," remand is not necessary where application of the proper legal standards would yield the same conclusion previously reached by the ALJ. (Def.'s Opp. to Pl.'s Mot. for J. on the Pleadings at 7, ECF No. 27.) Defendant argues that because Dr. Malik's opinion only found marked limitations in one functional domain, even if the ALJ had adopted the opinion, claimant would not have been found to be disabled. The court finds defendant's argument unavailing. As an initial matter, Dr. Malik's opinion relied on an incomplete record--the request for medical advice even noted that the teacher questionnaire lacked information on claimant's ability to attend and complete tasks and his speech intelligibility. (Tr. 240.) Additionally, the ALJ's failure to weigh Dr. Malik's opinion must be considered in conjunction with his failure to develop the record and the ALJ's failure to consider claimant's alleged speech impairment. The court cannot find with any degree of certainty that the ALJ would have still reached the same conclusion denying J.T.A.'s SSI claim in light of the foregoing.

## III. The ALJ Failed to Consider Claimant's Alleged Speech Disability

Plaintiff claimed that J.T.A. had a speech impairment disability in the initial application for SSI submitted on June 7, 2010. (Tr. 177.) At no point in ALJ Scheer's analysis, however, does he consider whether claimant's alleged speech disability constitutes a severe impairment, or whether it is an impairment in combination with other impairments that meets, or medically equals, the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, despite a record that shows speech impairment. *See*, *e.g.*, Tr. 165 (plaintiff questionnaire stating that J.T.A. has slurred speech and cannot pronounce words correctly); Tr. 180-81 (disability report stating that J.T.A. was testified for speech and language by DOE in October 2009 and receiving speech therapy at school); Tr. 188 (plaintiff questionnaire stating that J.T.A. received speech therapy from DOE); Tr. 236, 240 (Dr. Malik noting that claimant's speech is borderline); Tr. 85 (ALJ Friedman decision finding that J.T.A. has "severe impairment" of speech delay). In combination with the ALJ's failure to develop the record and consider Dr. Malik's opinion, the court finds that the ALJ's failure to expressly consider an alleged disability here warrants remand. *See, e.g.*, *Morales ex. rel Morales v. Barnhart*, 218 F. Supp. 2d 450, 460 (S.D.N.Y. 2002).

## CONCLUSION

For the foregoing reasons, the court denies the Commissioner's motion for judgment on the pleadings and remands this case for further proceedings consistent with this opinion. Specifically, the ALJ should:

(1) Fully develop J.T.A.'s complete educational record, including all special education evaluations, IEPs, related service provider progress reports, any psychological or educational tests, and teacher questionnaires.

(2) Consider and weigh medical opinions for all medical examiners.

(3) Consider and explicitly address J.T.A.'s alleged speech impairment.

(4) Expressly consider all relevant and probative evidence in the record and provide reasoned explanations for the ALJ's findings, based on such evidence.

The Clerk of the Court is respectfully directed to close this case.

**SO ORDERED.**

Dated:  Brooklyn, New York
        February 16, 2016

                                    _____/s/_____
                                    KIYO A. MATSUMOTO
                                    United States District Judge
                                    Eastern District of New York